CAROLYN SUE LeMARBE, Adm'r of the Estate of James G. LeMarbe, Deceased, Plaintiff-Appellant, *v.* DOW CHEMICAL COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)    No. 80-2296

Opinion filed December 14, 1981.

Michael H. Postilion, Ltd., of Chicago, for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, John W. Dondanville, and Richard H. Donohue, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

This is a wrongful death action based on strict tort liability brought by plaintiff, Carolyn Sue LeMarbe, administrator of the estate of her deceased husband, James G. LeMarbe, against defendants, Dow Chemical Company (Dow) and Thompson-Hayward Chemical Company (Thompson-Hayward). A jury found for defendants and judgment was entered for them on the verdict. Plaintiff appeals, presenting two issues: (1) whether questions asked of expert witnesses unreasonably called decedent's conduct into question, and (2) whether the trial court erred in not giving to the jury certain of plaintiff's instructions.

Dow manufactured a chemical with the trademark Chlorothene VG. This chemical was primarily used as a degreaser, cleaning grease off metal. It was distributed by Thompson-Hayward to industrial users. Deceased's employer, the General Electric Company, purchased this chemical for use in its plant in Chicago Heights.

In her amended complaint, plaintiff alleged that the chemical was defective and unreasonably dangerous because it did not contain adequate and accurate warnings of the danger in its use and of the toxic properties which could cause injury or death.

Chlorothene VG is a chemical solvent. It is a highly volatile product; it evaporates easily and creates fumes which are heavier than air. When breathed, these fumes can cause dizziness and lightheadedness (Chlorothene VG had once been used as an anesthetic agent), unconsciousness and, after a period of time, a comatose condition and death. The fumes

could also cause the heartbeat to be irregular, increasing the risk of death from atrial fibrillation.

In the industrial setting, Chlorothene VG was generally used in vapor degreasing operations, requiring the application of heat to vaporize the solvent. Metal passing through this vapor would be cleaned of grease and other foreign particles. Metal immersed in the solvent would also be cleaned. This process involved no heat.

General Electric used both methods in its metal-plating operations in Chicago Heights. This involved a large vapor degreasing machine, utilizing the hot process, and a "dip tank." In using the vapor degreaser, metals were passed through the machine on a conveyor belt. The dip tank was stationed next to the larger vapor degreaser. Pieces too large or exceptionally dirty were immersed in this tank to clean them. A hood covered the dip tank when it was not in use.

Deceased met his death when he was involved in the cleaning of the dip tank. He was found at the bottom of the drained tank in an unconscious state. Efforts to revive him with oxygen were futile. There was no detectable odor of the solvent in the tank; however, an odor was detectable in his regular work clothes. It was evident that the deceased had scraped some sludge from the wall of the dip tank. This sludge contained concentrated vapors with a high level of toxicity.

Extensive evidence was presented by both parties describing the chemical properties of Chlorothene VG, its toxicity and its use in the industrial setting. Several witnesses who worked for General Electric at the time of the incident testified as to the two degreasing processes, how they were operated and cleaned and how they also differed in operation. These witnesses also testified to the level of their knowledge of the toxic effects of the fumes released by the use and cleaning of the degreasing machines. Several expert witnesses testified about the adequacy of the label found on the two degreasing machines and whether, if the instructions were followed, decedent's death could have been prevented.

In pertinent part, the label posted on the two degreasing machines provided:

"This degreaser contains Chlorothene VG solvent. Chlorothene VG is the world's safest chlorinated vapor degreaser solvent. However, the following precautions must be followed:

One. Safety precautions. Use with adequate ventilation. Avoid prolonged or repeated breathing of vapors or contact with the skin. Do not take internally. Do not smoke around degreaser or while handling any chlorinated solvent. Do not enter the degreaser, pit or a storage tank or clean out a degreaser without proper ventilation or self-contained or air supplied breathing apparatus.

Gas masks are not adequate. Use a rescue harness with a life line. A second man must be present and observing at all times. Use protective equipment and appropriate protective garments. Protective garments should be discarded at first sign of solvent caused deterioration.

Train all operators in proper handling of Chlorothene VG.

Note: Keep away from flames and other ignition sources when used where vapors may be concentrated."

The label also contained two sections of instructions relating to the start-up and maintenance of a degreasing machine. These instructions are largely related to the vapor degreaser, rather than the dip tank. A fourth section set out instructions for a "clean-out" of a degreaser. One of these instructions read in part:

"Wear approved respiratory equipment and provide adequate protective clothing and ventilation."

A separate boxed-in section contained this statement:

"Chlorothene VG can be used for the vapor degreasing or cold cleaning of all common industrial metals including bronze, brass, zinc, copper, steel, stainless steel, aluminum, magnesium, nickel, Monel alloy, cadmium, tin, beryllium and titanium."

Plaintiff alleged that the Chlorothene VG was in a defective and unreasonably dangerous state because it did not warn of the dangers involved in its use. It is further alleged that the warning was inadequate because it failed to warn of the toxic properties of Chlorothene VG.

Recently, the supreme court held that a failure to warn could result in an action for strict liability despite the otherwise nonactionable nature of the product. (*Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959; *Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194.) In strict liability cases, warnings function either to shift the risk or reduce it. (82 Ill. 2d 211, 221.) The label posted on the dip tank in this case was to serve the latter function, to reduce the probability that harm would occur at all.

■■ The adequacy of warnings of either type usually presents a jury question. (*Palmer v. Avco Distributing Corp.*; *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) Likewise, the determination of what is unreasonably dangerous is usually a jury question. *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859; *Ebbert v. Vulcan Iron Works, Inc.* (1980), 87 Ill. App. 3d 74, 409 N.E.2d 112.

A review of the record reveals conflicting expert opinions on the adequacy of the label. Plaintiff's expert pointed out shortcomings in that the label did not warn specifically of the danger involved and did not spell out inherent dangers of the chemical compound itself. Defense ex-

perts, on the other hand, felt that the instructions adequately warned the reader of the proper techniques involved in handling Chlorothene VG. All of the experts testified that if the instructions on the label had been followed the accident would not have occurred. The jury heard this testimony and rendered its verdict.

■■ Plaintiff contends this expert testimony unnecessarily makes an issue of the decedent's conduct and that to allow this type of questioning and the answers is reversible error. *Gus T. Handge & Son Painting Co. v. Industrial Com.* (1965), 33 Ill. 2d 201, 210 N.E.2d 498; *Ryan v. Blakey* (1979), 71 Ill. App. 3d 339, 389 N.E.2d 604.

Defendant argues that plaintiff improperly preserved this issue for appeal by failing to object specifically to the questions and answers. Plaintiff claims that she did object and argued this objection before the trial court. The record reveals that plaintiff made a general objection, which was overruled, when defendants' first expert testified that the accident would not have occurred had the decedent followed the instructions. The issue of this objection arose the following day during an *in camera* discussion relating to a second expert's testimony. At this time, the trial judge appeared to equivocate on his decision. However, he ultimately followed his original ruling.

The record does not reveal any further objections. Plaintiff did not pursue this objection any further until her post-trial motion. Again, the trial judge followed his original ruling and allowed the questions and answers to stand. We note, too, that the record shows plaintiff's counsel also asked the very question which is here in controversy.

Even though specific objections to controverted facts must be made to preserve an issue (*Fletcher v. Industrial Com.* (1970), 44 Ill. 2d 359, 255 N.E.2d 403), we find that the questions were properly allowed. They were within the realm of direct or circumstantial evidence. *Gus T. Handge & Son Painting Co. v. Industrial Com.* (1965), 33 Ill. 2d 201, 206; *Estate of Whittington v. Emdeko National Housewares, Inc.* (1981), 96 Ill. App. 3d 1007, 422 N.E.2d 26 (where an expert testified to the reasonableness of the instructions for using home fire alarms).

In a recent case we noted the liability issue in a product liability case cannot be tried in a vacuum in which the product is isolated. (*Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309.) We do not feel that the questions propounded to the experts and their answers unreasonably called the decedent's conduct into question. No error was committed in this regard.

■■ Plaintiff next argues that her Instruction 5 should have been given and that Instructions 9A and 11A were improperly given. Instruction 5 stated:

> "The conduct of the decedent James G. LeMarbe is no defense to this case."

In *Sanchez v. Black Brothers Co.*, the rejection of a similar instruction was upheld. We there said:

"* * * [T]he court should not instruct the jury as to the insignificance of plaintiff's conduct in a product liability case. Counsel in his closing argument may adequately inform the jury of the insignificance of plaintiff's conduct with respect to the issues and his theory of the case without the 'assistance' of comment by the court on that specific element of the evidence." (98 Ill. App. 3d 264, 268-69.)

Instruction 5 was properly refused.

Plaintiff's tendered Instructions 9 and 11, reading:

"Plaintiff's Inst. 9

The Plaintiff claims that James G. LeMarbe died as a result of the use of the solvent and that there existed in the solvent at the time it left the control of the defendants a condition which made the solvent unreasonably dangerous in the following respect:

 (a) It was not accompanied by adequate and accurate warnings.

The plaintiff further claims that the foregoing was a proximate cause of the death of James G. LeMarbe.

The defendants deny that any claimed condition of the solvent made the solvent unreasonably dangerous; and deny that any claimed condition of the solvent was a proximate cause of the death of James G. LeMarbe.

The defendants further deny that James G. LeMarbe died as a result of the condition of the solvent."

"Plaintiff's Inst. 11

The plaintiff has the burden of proving each of the following propositions:

First, that the condition claimed by the plaintiff as stated to you in these instructions existed in the solvent;

Second, that the condition made the solvent unreasonably dangerous;

Third, that the condition existed at the time the solvent left the control of the defendants;

Fourth, that James G. LeMarbe died."

were rejected by the trial court and the following instructions were given to the jury in their stead:

"Inst. 9-A

The plaintiff claims that James G. LeMarbe died as a result of the use of the solvent and that there existed in the solvent at the time it left the control of the defendants a condition which made the solvent unreasonably dangerous in one or more of the following respects:

It was not accompanied by adequate and accurate warnings.

The plaintiff claims that the foregoing was a proximate cause of the death of James G. LeMarbe.

The defendants deny that the claimed condition of the label made the solvent unreasonably dangerous; and deny that the claimed condition of the label was a proximate cause of the death of James G. LeMarbe."

"Inst. 11-A

The plaintiff has the burden of proving each of the following propositions:

First, that the condition claimed by the plaintiff as stated to you in these instructions existed in the solvent;

Second, that the condition of the label made the solvent unreasonably dangerous;

Third, that the condition existed at the time the solvent left the control of the defendants."

Plaintiff argues that changing her instructions 9 and 11 to exclude the word "solvent" and to include the word "label" was prejudicial and unfairly reinforced defendants' position. We disagree.

Taken as a whole, we feel the instructions given were sufficiently clear so as not to mislead the jury and fairly and correctly stated the law and plaintiff's theory that the product was unreasonably dangerous because of an inadequate warning of the danger. *Smith v. Verson Allsteel Press Co.* (1979), 74 Ill. App. 3d 818, 393 N.E.2d 1; *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583.

The record shows that the label contained instructions for the proper handling of the degreasing machines. From the evidence presented by both parties, the jury could have reasonably determined that the warnings and instructions contained on the label were adequate and that if they had been followed decedent's death would not have ensued.

As a result, we cannot say that the evidence so overwhelmingly favors plaintiff that a judgment for defendants could never stand (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), or that the trial court committed error in the admission of evidence or in in-

structions given to the jury. The judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMBPELL, P. J., and GOLDBERG, J., concur.