723 F.2d 1311
 Leonard GRACYALNY and Patricia Gracyalny, Plaintiffs-Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.
Michael STEIER and Virginia Steier, Plaintiffs-Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee,
Roberta K. SHERWOOD, Personal Representative of the Estate
of Francis Sherwood, and Roberta K. Sherwood,
Individually, Plaintiff-Appellant,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.
 No. 82-2499.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 17, 1983.
Decided Dec. 15, 1983.
 
 1
 Fred F. Kaftan, Kaftan, Kaftan, Kaftan, Van Egeren, Ostrow Gilson & Geimer, Green Bay, Wis., for plaintiffs-appellants.
 
 
 2
 Richard C. Ninneman, Whyte & Hirschboeck, Milwaukee, Wis., for defendant-appellee.
 
 
 3
 Before CUDAHY, ESCHBACH, Circuit Judges, and ASPEN, District Judge.*
 
 
 4
 ASPEN, District Judge.
 
 
 5
 Appellants Leonard and Patricia Gracyalny, Michael and Virginia Steier, and Roberta K. Sherwood, individually and as personal representative of her husband Francis Sherwood, appeal from the order of the district court granting appellee Westinghouse Electric Corporation's motion for summary judgment in this action in strict tort liability and negligence.[1] For reasons set forth herein, we reverse and remand.
 
 
 6
 In 1964, Westinghouse delivered a unit of its Model 144-GC-500 oil circuit breaker to Wisconsin Public Service Corporation ("WPS"), where it was installed at the WPS Quincy Street substation in Green Bay, Wisconsin.[2] On August 8, 1979, Francis Sherwood, Leonard Gracyalny and Michael Steier, employees of WPS, were testing this unit at the Quincy Street substation, when it exploded and caught fire. All three men were seriously burned, and Sherwood died of his injuries four days later.[3]
 
 
 7
 Oil circuit breakers are designed to interrupt current in an electrical distribution system in the event that a short circuit or other fault in the system occurs. This interruption is accomplished through a series of contacts contained within a large tank and surrounded by oil. When a fault occurs in the electrical distribution system, the contacts within the oil circuit breaker separate, resulting in arcing between the contacts. The quenching of the arcing in the oil (used because of its superior insulation qualities) acts to inhibit the flow of the electrical current. Model 144-GC-500 includes a dashpot, a relatively small container located near the top of the tank and partially submerged in the oil within the tank. The dashpot contains a piston and has a small opening at its bottom. When the oil circuit breaker interrupts the electrical current, the piston moves down forcing the oil in the dashpot into the tank.
 
 
 8
 Between November, 1964, and January 20, 1965, Westinghouse learned that units of Model 144-GC-500 were malfunctioning. The malfunctions reportedly occurred when the breaker interrupted low magnitude current. Westinghouse assigned George B. Cushing, an engineer, to determine the cause of the problems. Cushing tested Model 144-GC-500 and found that improper arcing from the top of the main contact to the dashpot, located above that contact, caused the breaker failure.[4] In laboratory testing, Cushing simulated breaker failure and observed that the terminal of the arc was on the bottom of the dashpot. Arcing occurred when the piston in the dashpot was moving down, discharging oil into the tank. Since the dashpot normally contained air bubbles, the piston would discharge a mixture of oil and air into the tank, resulting in a line of bubbles extending down from the dashpot to the main contact. The bubbles created a path through the oil along which arcing would occur.[5]
 
 
 9
 Cushing recommended that a barrier of insulating material be installed beneath the dashpot to correct this malfunction. To achieve this, he developed an L-shaped baffle. The baffle was designed to extend beneath the dashpot and deflect the discharge to the surface of the oil, thereby eliminating the possibility of arcing to the bottom of the dashpot. This baffle was installed on all new 144-GC-500 1200 ampere oil circuit breakers.
 
 
 10
 Westinghouse also decided to furnish baffles to customers already using Model 144-GC-500. Cushing sent a memorandum dated March 17, 1965, to Westinghouse's electric utility manager, F.P. Tauger, which reported instances of malfunctioning oil circuit breakers and specified that "[i]n at least three instances the resulting internal short circuit has caused severe damage to the breaker involved. In two instances the safety of personnel was in jeopardy." Cushing also recommended that the dashpot baffle be installed. Tauger, in turn, sent a letter to Westinghouse electric zone managers recommending that their customers install the baffles at a convenient time. Since installation was a relatively simple procedure, the customers were to install the baffles themselves. The communications by Cushing and Tauger stated that there were seven failures and over 2,000 breakers in service.[6] Cushing and Tauger's communications also warned that the potential consequences of failure were serious.
 
 
 11
 On April 13, 1965, Westinghouse transmitted a letter under the signature of sales manager C.A. Lins to WPS, discussing the failure of oil circuit breakers. The letter stated, inter alia, that:
 
 
 12
 We now have over 2,000 14.4 KV circuit breakers of the type "144 GC" in service. Out of this number of breakers our attention has been drawn to seven failures which occurred when interrupting currents of few amperes under recovery voltage conditions which would normally appear harmless. Although this is a very small percentage of failures, since this is a single tank type breaker the resulting failures became phase-to-phase failures with the possibility of extensive damage to other equipment and personnel. For this reason we instituted a very through [sic] investigation in an effort to determine the reason for the failures.
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 We will provide baffles for your installation at a convenient time without charge. In looking over my records, I find that one of this type of breaker is installed at Menominee under your requisition 79560, and three breakers were shipped to Quincy Street under requisition 81895. You may also have other breakers of this type on which the records have been removed from my files. Please note that the 144 G type of breaker is not affected.
 
 
 16
 Please let me know how many of these baffles will be required. We anticipate that installation can be made by your personnel at some convenient inspection time and we do not believe that the incidence of trouble would suggest that an immediate program be initiated to install the baffles.
 
 
 17
 In response to this letter, WPS wrote Westinghouse on April 15, 1965, requesting baffles for seven oil circuit breakers. One of the circuit breakers listed by WPS was a Series 230 breaker, which Westinghouse had not specifically mentioned in prior correspondence. However, WPS did seek baffles for all three Model 144-GC-500 circuit breakers at the Quincy Street substation. Westinghouse subsequently shipped WPS six baffles.
 
 
 18
 Of the seven circuit breakers listed by WPS in their April 15, 1965, letter, baffles were installed on five, including two at the Quincy Street substation. A baffle was located on the shelf of a storage department in Wausau and was installed on a sixth breaker located in Wausau, Wisconsin. No dashpot baffle, however, was installed on the oil circuit breaker that exploded and caught fire on August 8, 1979.
 
 
 19
 The district court detailed a number of undisputed facts in the record. C.A. Lins, the Westinghouse sales manager under whose signature the letter notifying WPS of circuit breaker failures was sent, had no recollection of the failure of 144-GC-500 circuit breakers mentioned in Cushing's March 17, 1965, report. He also did not recall any personal contact with WPS concerning the installation of baffles. After Westinghouse sent baffles to WPS, Westinghouse undertook no follow up procedures to verify that the baffles were installed. Finally, no circuit breaker equipped with a dashpot baffle has ever failed, and the parties agreed that the accident would not have occurred had the baffle been properly installed.
 
 
 20
 In granting Westinghouse's motion for summary judgment, the district court emphasized the WPS is a skilled company involved in a highly technical enterprise. Determining that Westinghouse could rely on WPS to properly install the baffles, the district court held that the letter sent to WPS and the furnishing of uninstalled baffles constituted an adequate warning. The court added that insofar as the defect in the circuit breaker was hidden, Westinghouse's letter rendered the defect "open and obvious." Finally, the court concluded that Westinghouse's argument that WPS's failure to install the baffle on the malfunctioning circuit breaker constituted a superseding cause of appellants' injuries "appears to have merit."
 
 
 21
 Appellants contend before us that the circuit breaker contained a hidden defect which rendered it unreasonably dangerous, and that Westinghouse had a nondelegable duty to make certain that the baffle was properly installed on the circuit breaker. Furthermore, they argue that Westinghouse's warning to WPS did not render the defect open and obvious, since Westinghouse had a duty to also warn WPS employees of the defect. Further, appellants contend that, in any event, the warning to WPS was inadequate.[7]
 
 
 22
 Westinghouse insists that sending a letter to WPS and providing baffles constituted an adequate warning as a matter of law, particularly in light of WPS's awareness of the inherently dangerous nature of the electricity transmission business. According to Westinghouse, there was no need to warn WPS employees directly, and the Wisconsin safe place statute imposed a duty on WPS to provide for the safety of its employees. Westinghouse further contends that its warnings rendered the defect "open and obvious," and that a manufacturer's duty to install safety devices on its products, while nondelegable during the course of manufacture, does not extend to situations where a defect is discovered after the product has been marketed. In addition, Westinghouse reasons that the intervening conduct of WPS in failing to install a baffle on the oil circuit breaker constitutes a superseding cause of appellants' negligence precluding Westinghouse's liability.
 
 
 23
 We hold that the adequacy of the warning is an issue of fact to be determined by the jury. A manufacturer may have a duty to install safety devices to remedy defects discovered after its product has been marketed. Westinghouse was aware that WPS did not understand which of its circuit breakers needed baffles. The factual question of whether Westinghouse's handling of the circuit breaker problem was negligent is a jury question.
 
 II.
 
 24
 Summary judgment for a defendant is proper under Fed.R.Civ.P. 56(c) only if the pleadings, depositions and affidavits fail to disclose a genuine issue of material fact. In deciding this question, courts are to resolve all doubts against the party seeking summary judgment. Trotter v. Anderson, 417 F.2d 1191, 1192 (7th Cir.1969). As one court has observed,
 
 
 25
 [s]ince tort actions generally encompass a multitude of factual issues and abstract concepts that become elusive when applied to varying concrete factual situations, such actions are usually not appropriate for disposition by summary judgment.
 
 
 26
 Hughes v. American Jawa, Ltd., 529 F.2d 21, 23 (8th Cir.1976).
 
 
 27
 In negligence cases, questions concerning the reasonableness of the parties' conduct, foreseeability and proximate cause particularly lend themselves to decision by a jury. E.g., Cook v. Baker Equipment Engineering Co., 582 F.2d 862, 865 (4th Cir.1978); see also, TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 n. 12, 96 S.Ct. 2126, 2133, n. 12, 48 L.Ed.2d 757 (1976). Thus, summary judgment is rarely appropriate in negligence cases. Ceplina v. South Milwaukee School Board, 73 Wis.2d 338, 342-43, 243 N.W.2d 183, 185 (1975). Similarly, in cases brought under a theory of strict tort liability, whether a product has a design or manufacturing defect may also be an issue of material fact precluding summary judgment. Hughes v. American Jawa, Ltd., 529 F.2d 21, 25 (8th Cir.1976). The trial record must be examined in light of these general standards to ascertain whether summary judgment was properly granted, at the same time recognizing that a grant of summary judgment may be affirmed on any ground that finds support in the record. Helvering v. Gowran, 302 U.S. 238, 245-46, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937); Cannon v. University of Health Sciences/The Chicago Medical School, 710 F.2d 351, 363 (7th Cir.1983).
 
 
 28
 Appellants' theories of liability include both negligence and strict products liability.[8] In Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55 (1967), the Wisconsin Supreme Court adopted section 402A of the Restatement 2d of Torts,[9] characterizing the concept of strict products liability as "negligence per se." Id. at 460-61, 155 N.W.2d at 63-64.[10] See also Powers v. Hunt-Wesson Foods, 64 Wis.2d 532, 219 N.W.2d 393 (1974). In strict liability cases, a plaintiff must prove
 
 
 29
 (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.
 
 
 30
 Id. 37 Wis.2d at 460, 155 N.W.2d 63. The emphasis upon a defective product unreasonably dangerous to the user distinguishes strict liability from negligence, which is based upon the conduct of the parties, and whether a party breached its duty of ordinary care. Howes v. Deere & Co., 71 Wis.2d 268, 275, 238 N.W.2d 76, 80 (1976). Strict products liability and negligence thus constitute alternative theories of recovery in Wisconsin products liability cases. Hansen v. Cessna Aircraft Co., 578 F.2d 679 (7th Cir.1978); Vincer v. Esther Williams All-Aluminum Swimming Pool Co., 69 Wis.2d 326, 330, 230 N.W.2d 794, 797 (1975).
 
 
 31
 In the instant case, a strict products liability analysis would focus upon whether Westinghouse's oil circuit breaker was in a defective condition unreasonably dangerous to the user when it left Westinghouse's control. The failure to provide adequate warnings concerning a product can constitute a defect rendering the product unreasonably dangerous. Barber v. General Electric Co., 648 F.2d 1272, 1277 (10th Cir.1981); Kimble v. Waste Systems International, 23 Wash.App. 331, 595 P.2d 569, 572 (1979). Accord, Hasbrouck v. Armour & Co., 139 Wis. 357, 364-65, 121 N.W. 157, 160 (1909). Thus, if Westinghouse's warnings were inadequate, it may be strictly liable to appellants. With regard to negligence, the conduct of Westinghouse in providing the warnings and baffles must be examined in order to decide whether Westinghouse breached its duty of care to appellants.[11] Therefore, our initial inquiry under both negligence and strict liability analysis concerns the scope of Westinghouse's duty, as a manufacturer, to provide warnings for the use of its circuit breakers.
 
 
 32
 A manufacturer has a duty to warn customers or users of defective conditions which may render its products unreasonably dangerous, as well as of any risks of injury that may be associated with its products. DeSantis v. Parker Feeders, Inc., 547 F.2d 357, 363 (7th Cir.1976); Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 898-99, 275 N.W.2d 915, 922-23 (1979).[12] This duty to warn extends not only to hazards which become apparent at the time of sale, but also to dangers which arise after marketing. Labelle v. McCauley Industrial Corp., 649 F.2d 46 (1st Cir.1981); Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 275 N.W.2d 915 (1979); Rodriguez v. Besser, 115 Ariz. 454, 565 P.2d 1315 (Ct.App.1977); do Canto v. Ametek, Inc., 367 Mass. 776, 328 N.E.2d 873 (1975); Braniff Airways v. Curtiss-Wright Corp., 411 F.2d 451 (2d Cir.1969), cert. denied, 396 U.S. 959, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969).[13] The Wisconsin Supreme Court discussed the scope of this duty in Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 275 N.W.2d 915 (1979), where plaintiff's decedent was injured when a sausage stuffing machine, first marketed in 1938, malfunctioned in the 1970's. A safety device for the machine was developed in 1946 and became standard equipment on the machine after 1971. However, during two visits to the factory, a manufacturer's representative never informed decedent's employer of the safety device, nor of the hazard it was designed to prevent. In holding that the adequacy of the manufacturer's warning should have been submitted to the jury, the court recognized a continuing duty on the part of manufacturers to warn of dangers in their products, but added that:
 
 
 33
 [w]e do not in this decision hold that there is an absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer and the nature of that industry bears no similarity to the realities of manufacturing and marketing household goods such as fans, snowblowers or lawn mowers which have become increasingly hazard proof with each succeeding model. It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards on household items, mass produced and used in every American home, when the product is 6 to 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of the art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period.
 
 
 34
 Id. at 901, 275 N.W.2d 923-24. The court then distinguished mass consumer products from industrial machines, finding no duty to warn of safety improvements as to the former. Kozlowski also imposes upon at least some manufacturers an on-going duty to notify users of safety improvements. This duty is based, in part, on the notion that manufacturers obtain information both about defects in their products and technological advances in their fields in the ordinary course of business. Customers, on the other hand, cannot reasonably be expected to obtain such information without considerable time and expense. Comment, The Manufacturer's Duty to Notify of Subsequent Safety Improvements, 33 Stan.L.Rev. 1087, 1090-93 (1981).[14]
 
 
 35
 The law as to precisely what information must be provided by the manufacturer has been evolving;[15] and most recently, courts have been employing a flexible case-by-case approach in evaluating the adequacy of a particular warning.[16] The Wisconsin Supreme Court in Schuh v. Fox River Tractor Co., 63 Wis.2d 728, 218 N.W.2d 279 (1974), in making such an evaluation, first observed that the adequacy of a warning is an issue for the jury, id. at 738, 218 N.W.2d at 284. The court went on to set forth the elements of an adequate warning:
 
 
 36
 [v]arious general criteria against which a warning is to be measured to determine its adequacy have been stated by the courts. Thus, it has been said that a seller must give the purchaser of a dangerous article a warning that is accurate, strong, and clear, and readily noticeable.
 
 
 37
 Any ambiguity in the language of a warning furnished in connection with the sale of a chattel is to be "construed against the one who chose the words used."
 
 
 38
 The warning must be appropriate; implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that the likelihood of an accident's taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, and that there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous.
 
 
 39
 Id. at 739, 218 N.W.2d 285, citing 63 Am.Jur.2d Products Liability Sec. 53 (1972).
 
 
 40
 Included among other circumstances to be considered in evaluating the adequacy of a warning are the status of the person using the product and whether a particular danger was "open and obvious." This Court has previously stated that
 
 
 41
 a manufacturer's duty to impart information as to the safe use of its product, whether it be by warnings or instructions, is significantly minimized where the user is a member of a particular trade or profession with regard to a danger that is generally known to that trade or profession. Certainly the intended user's training and experience must be considered where the issue of a manufacturer's duty to guard against and apprise of danger is concerned.
 
 
 42
 Collins v. Ridge Tool Co., 520 F.2d 591, 596 (7th Cir.1975). The appellee in Collins, a master plumber who had previously owned five of the products at issue and who had used the product "hundreds of times," testified that he fully appreciated the risk of being injured by the machine. Collins held that the master plumber's negligence was the sole cause of his injuries, and that there was no basis for the trial court's finding that the machine's manufacturer was negligent. Id. Collins declined to apply the traditional "open and obvious" rule, which provides that a manufacturer is under no duty to guard against or give notice of dangers which are obvious to the user. Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802, 804 (1950), overruled, Micallef v. Miehle Co., 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976). Rather, it declared that the facts of each case must be considered, including the status and training of the user. 520 F.2d at 595-96.
 
 
 43
 In still another case involving Wisconsin law, DeSantis v. Parker Feeders, Inc., 547 F.2d 357 (7th Cir.1976), this Court again addressed the issue of obvious dangerousness. In response to appellant's argument that an automatic cattle feeder was dangerous, it was observed that:
 
 
 44
 it does not necessarily follow that the manufacturer of such a machine has no duty to warn the public of the precise nature of the dangers involved. The rule in Wisconsin is that in any case where the average consumer might not reasonably anticipate and fully appreciate the dangerous condition of a product or the attendant risk of injury, the manufacturer has a duty to warn.
 
 Id. at 363.[17]
 
 45
 An additional aspect of a manufacturer's duty to warn involves two issues: (a) whether the manufacturer's duties may be delegated, and (b) how far down the chain of distribution a warning concerning a hazardous or defective product may extend. As to the first issue, it is established that a manufacturer may not delegate the duty to design and manufacture a reasonably safe product to a dealer, purchaser or user. Shawver v. Roberts Corp., 90 Wis.2d 672, 683, 280 N.W.2d 226, 231-32 (1979); Christopherson v. Hyster Co., 58 Ill.App.3d 791, 16 Ill.Dec. 83, 374 N.E.2d 858 (1978); Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A.2d 893, 903 (1975). As to the second, courts have found that manufacturers have a nondelegable duty to install safety devices on their products where the products would be unreasonably dangerous absent such a device. Derrick v. Yoder Co., 88 Ill.App.3d 864, 875, 43 Ill.Dec. 897, 905, 410 N.E.2d 1030, 1038 (1980).[18]
 
 
 46
 Several jurisdictions have defined a manufacturer's duty to include the providing of warnings beyond the immediate purchaser of a product. E.g., Brizendine v. Visador Co., 437 F.2d 822, 828 (9th Cir.1970); West v. Broderick & Bascom Rope Co., 197 N.W.2d 202 (Iowa 1972); Ford Motor Co. v. Robert J. Poeschl, Inc., 21 Cal.App.3d 694, 98 Cal.Rptr. 702, 705 (1972). But cf., Carmichael v. Reitz, 17 Cal.App.3d 958, 95 Cal.Rptr. 381 (1971) (absent special circumstances, drug manufacturer's duty to warn extends only to doctors and not directly to the patient). Since a manufacturer may be able to foresee that warnings conveyed to purchasers of its products may not reach the individual users of those products, the duty to warn has been extended to the users of products. Hopkins v. Chip-in-Saw, Inc., 630 F.2d 616 (8th Cir.1980). Therefore, simply warning an immediate purchaser or dealer may not be enough. As one court has observed:
 
 
 47
 [t]o allow a manufacturer to insulate itself from liability for harm caused by a defective product (which it built, designed and placed into the stream of commerce) by merely sending a single warning notice to its dealer would defeat the policy and purpose of strict liability which is to protect the consumer, who is oftentimes unwary or unable to protect himself and to place the liability on those who are responsible for the harm and best able to absorb the loss....
 
 
 48
 Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129, 1137 (9th Cir.1977). Accordingly, the court held that an engine manufacturer who sent a letter to its dealers instructing them to install new filters in the engines could not escape strict liability for engine failures. Wisconsin courts have also recognized a manufacturer's duty to make reasonable efforts to bring warnings to the attention of potential users of their products. Schuh v. Fox River Tractor Co., 63 Wis.2d 728, 738, 218 N.W.2d 279, 284 (1974).
 
 
 49
 A manufacturer's duty to warn users or consumers about dangers in its products involves a number of distinct issues. But there is a unifying theme as to all these issues: the adequacy of a particular warning is a question of fact to be decided by a jury. Schuh v. Fox River Tractor Co., 63 Wis.2d 728, 218 N.W.2d 279 (1974). See also Pedrson v. Hevi-Duty Electric, 618 S.W.2d 784 (Tex.Civ.App.1981); LeMarbe v. Dow Chemical Co., 102 Ill.App.3d 587, 58 Ill.Dec. 235, 237, 430 N.E.2d 177, 179 (1981); Reiger v. Toby Enterprises, 45 Or.App. 679, 609 P.2d 402, 405 (1980); Seibel v. Symons Corp., 221 N.W.2d 50, 57 (N.D.1974).
 
 
 50
 In considering the adequacy of a warning, the jury should view all of the evidence in the record, considering the nature of the product and the relative degree of danger it presents. Berkebile v. Brantly Helicopter Corp., 462 Pa. 83, 337 A.2d 893, 902 (1975). The clarity of any warnings that were provided is also important; accompanying a warning with misleading representations of safety may serve to render the warning inadequate. Bryant v. Technical Research Co., 654 F.2d 1337, 1345-46 (9th Cir.1981).
 
 
 51
 The district court herein determined that the April 13, 1965, letter from Westinghouse to WPS, together with its act of furnishing baffles for the circuit breakers, constituted an adequate warning as a matter of law. In making this determination, the court was influenced by the fact that WPS was a highly-skilled firm involved in a complex, technical enterprise. We agree that the status of WPS, as well as the training and experience of appellants, are factors to be considered in determining the adequacy of the warning. Collins v. Ridge Tool Co., 520 F.2d 591, 596 (7th Cir.1975). But the analysis does not end there.
 
 
 52
 Several additional circumstances also should have been considered. A jury, for example, might find that language in Westinghouse's letter of April 13, 1965,[19] served to minimize the danger presented by the defective circuit breakers. The jury might determine, moreover, that Westinghouse was negligent in failing to follow up its warning letter of April 13, 1965, with another letter or a personal visit by a sales representative to WPS offices. This subsequent communication could have reiterated the warning or sought to verify that baffles were properly installed.[20] And given the serious nature of a circuit breaker malfunction, a jury could determine that Westinghouse itself should have undertaken to install the baffles. Perhaps Westinghouse should have also undertaken to warn WPS employees who came into direct contact with the circuit breakers. And finally, whether the letter and furnishing of baffles rendered the defect in the circuit breakers "open and obvious" is also an issue best left to a jury. See Collins v. Ridge Tool Co., 520 F.2d 591, 597 (7th Cir.1975) (Campbell, J., dissenting).[21] Because of all these jury questions, it was error for the district court to grant summary judgment on the issue of whether Westinghouse's warnings to WPS were adequate.
 
 III.
 
 53
 It is unclear whether the district court based its grant of summary judgment on the alternative ground that WPS's failure to install the baffle on the malfunctioning circuit breaker was a superseding cause of appellants' injuries, thereby relieving Westinghouse of legal responsibility.[22] Insofar as superseding cause was an alternative basis for the district court's holding, we reverse its grant of summary judgment. Resolution of this issue at the summary judgment stage is premature.
 
 
 54
 Superseding cause has been defined as an act by a third person or other force which by its intervention prevents a negligent person from being held liable for harm to another. Diener v. Heritage Mutual Insurance Co., 37 Wis.2d 411, 418, 155 N.W.2d 37, 41 (1967).[23] Application of the superseding cause doctrine relieves a tortfeasor from liability for conduct which has been a substantial factor in producing injury. Stewart v. Wulf, 85 Wis.2d 461, 271 N.W.2d 79 (1978). This is another way of saying that the actor's conduct is too remote from the injury to impose liability.[24] Under Wisconsin law, only after the trier of fact has determined that the first actor's conduct was indeed a substantial factor in causing harm must a court decide whether the superseding cause doctrine should apply. U.S. Fidelity & Guarantee v. Frantl Industries, Inc., 72 Wis. 478, 490, 241 N.W.2d 421 (1976).[25]
 
 
 55
 A key inquiry in resolving the question of superseding cause is foreseeability. Ruff v. Burger, 32 Wis.2d 141, 150, 145 N.W.2d 73, 77-78 (1966). Therefore, where a plaintiff is injured by a manufacturer's product, the intervening negligence of the plaintiff's employer does not insulate the manufacturer from liability unless the employer's acts or omissions are unforeseeable. Minert v. Harsco Corp., 26 Wash.App. 867, 614 P.2d 686, 688, 691 (1980).[26] Wisconsin law recognizes the antecedent tortfeasors should not be relieved of liability as the result of consequences which they should have anticipated under the circumstances. Ruff v. Burger, 32 Wis.2d 141, 151, 145 N.W.2d 73, 78 (1966).[27]
 
 
 56
 As a result, we believe that it has not been established, as a matter of law, that WPS's failure to install the baffle was a superseding cause of appellants' injuries. WPS's failure to install the baffle may indeed have been foreseeable--there is evidence in the record indicating that WPS was confused as to precisely on which circuit breakers the baffles should be installed. Since Westinghouse's role in the events surrounding the malfunctioning circuit breaker does not appear to be too remote from appellants' injuries, we cannot conclude as a matter of law that Westinghouse should be insulated from liability due to WPS's negligence. Whether WPS's lapse was foreseeable is an issue of fact to be decided by the jury, and summary judgment upon this basis is therefore inappropriate.
 
 
 57
 For the foregoing reasons, the judgment of the district court is reversed, and the cause is remanded for proceedings consistent with this opinion. It is so ordered.
 
 
 
 *
 The Honorable Marvin E. Aspen, United States District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The district court, by agreement of the parties, consolidated these three cases for trial purposes
 
 
 [2]
 Model 144-GC-500 was designed in 1958 to handle continuous electrical current of 14,400 volts, a maximum of 15,500 volts, and 1200 amperes. It was initially manufactured in 1959
 
 
 [3]
 At the time of the accident, Sherwood, Steier and Gracyalny, as employees of WPS, participated in Wisconsin's Workers Compensation Law, Wis.Stat. Sec. 102.01 et seq. (1982). Since they have received compensation under this statute, they have no right to damages against their employer. Wis.Stat. Sec. 102.03(2) (1982)
 
 
 [4]
 The oil circuit breaker contains an "interrupter" which, according to appellants, is a series of grids and orifices surrounding the principal contact. The 144-GC-500 1200 ampere oil circuit breaker also contains a contact located outside the interrupter, to which Cushing referred as the main contact. This opinion will also refer to this contact as the main contact
 
 
 [5]
 We have earlier stated that problems with the 144-GC-500 1200 ampere oil circuit breaker reportedly occurred when the circuit breaker was interrupting low magnitude electrical current. Apparently, when oil circuit breakers interrupt high levels of electrical current, turbulence is created in the oil within the tank and bubbles discharged from the dashpot are dissipated. But the interruption of low levels of current is not accompanied by turbulence and bubbles discharged from the dashpot are not similarly dissipated
 
 
 [6]
 The district court also noted that a total of 1,893 oil circuit breakers were sold, approximately 745 of which were Model 144-GC-500's
 
 
 [7]
 Appellants have argued that Westinghouse's conduct is so egregious as to merit an award of punitive damages. Appellants did not present this issue to the trial court, and we therefore decline to reach this question. Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); American Fletcher Mortgage Co. v. Bass, 688 F.2d 513, 520 (7th Cir.1982)
 
 
 [8]
 Appellants are citizens of Wisconsin, while Westinghouse is a corporation with its principal office and place of business in Pennsylvania. All events at issue took place in Wisconsin. Federal courts in diversity of citizenship cases must determine what the rule of law in the state is and apply it; they are not free to ignore state substantive law. Hansen v. Cessna Aircraft Co., 578 F.2d 679, 684 (7th Cir.1978). In the present matter it is undisputed that Wisconsin law governs the issues at bar, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and we must determine the issues presented by this case as we believe the Wisconsin courts would under the circumstances. Collins v. Ridge Tool Co., 520 F.2d 591, 595 (7th Cir.1975), cert. denied, 424 U.S. 949, 96 S.Ct. 1421, 47 L.Ed.2d 355 (1976)
 
 
 [9]
 Section 402A of the Restatement 2d provides that:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller.
 
 
 [10]
 For a thorough discussion of the development of strict tort liability in Wisconsin, see Hansen v. Cessna Aircraft Co., 578 F.2d 679 (7th Cir.1978)
 
 
 [11]
 In this regard, Sec. 388 of the Restatement 2d of Torts provides that:
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 Sec. 388 involves negligent failure to warn of dangerous conditions in a chattel, and thus represents an analytically distinct theory of liability from Sec. 402A, which imposes liability without fault upon the seller of a defective and unreasonably dangerous product. d'Hedouville v. Pioneer Hotel Co., 552 F.2d 886, 892 (9th Cir.1977). However, in duty to warn cases, emphasis upon the nature and scope of the warning has led to a convergence of the functional identities of strict products liability and negligence. Kidwell, The Duty to Warn: A Description of the Model of Decision, 53 Tex.L.Rev. 1375, 1378 (1975).
 
 
 [12]
 But, cf., Borowicz v. Chicago Mastic Co., 367 F.2d 751, 760 (7th Cir.1966) (requiring manufacturers to warn or protect against every injury which may result from the use of their products would be "totally unreasonable"). The warning must be adequate and appropriate under the circumstances. Kozlowski v. John E. Smith's Sons Co., 87 Wis.2d 882, 899, 275 N.W.2d 915, 922 (1979), citing Annot. 76 A.L.R.2d 15 (1961). Thus, providing an inadequate warning when there is a duty to warn has been held to be no better than providing no warning whatsoever. Post v. American Cleaning Equipment Co., 437 S.W.2d 516, 521 (Ky.Ct.App.1968)
 
 
 [13]
 In Comstock v. General Motors Corp., 358 Mich. 163, 99 N.W.2d 627 (1959), an automobile dealer's employee was injured by a Buick with defective brakes. The manufacturer had previously learned of the defect and sent a letter to Buick dealers instructing them to repair the brakes. In holding that the manufacturer should have conveyed effective warnings to purchasers of its automobiles with power brakes, the Court declared, with respect to the manufacturer's duty, that
 [i]f such a duty to warn of a known danger exists at point of sale, we believe a like duty to give prompt warning exists when a latent defect which makes the product hazardous to life becomes known to the manufacturer shortly after the product has been put on the market.
 
 
 [99]
 N.W.2d at 627
 
 
 [14]
 As a result of this asymmetry of information, some courts have imposed upon manufacturers a continuing duty to warn of defects and safety improvements in their products. But see, Jackson v. New Jersey Manufacturers Insurance Co., 166 N.J.Super. 448, 400 A.2d 81, 89 (1979)
 
 
 [15]
 In Rekab, Inc. v. Frank Hrubetz & Co., 261 Md. 141, 274 A.2d 107 (Ct.App.1971), the court held that a letter from the manufacturer to an amusement park operation which stated the manufacturer's intent to install a new part in an amusement park "ride," plus supplying the new part, was an adequate warning as a matter of law. This was so despite language in the letter which declared that the replacement part was a "purely precautionary" arrangement. And the court in Nishida v. E.I. duPont de Nemours & Co., 245 F.2d 768 (5th Cir.1976), cert. denied, 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 275 (1958), held that personal delivery of a single letter from a chemical manufacturer to a soybean producer concerning dangers associated with a chemical used to process soybeans was sufficient to exempt the manufacturer from liability
 
 
 [16]
 E.g., Bryant v. Technical Research Co., 654 F.2d 1337, 1348 (9th Cir.1981); Dougherty v. Hooker Chemical, Inc., 540 F.2d 174, 179 (3d Cir.1976)
 
 
 [17]
 Courts in other jurisdictions have rejected the traditional open and obvious rule in favor of a broader test involving the balancing of several different factors. E.g., Holm v. Sponco Mfg. Co., 324 N.W.2d 207 (Minn.1982)
 
 
 [18]
 This is so, according to one court, because "[t]he only way to be certain that such devices will be installed on all machines--which clearly the public interest requires--is to place the duty on the manufacturer where it is feasible for him to do so." Bexiga v. Havir Mfg. Co., 60 N.J. 402, 290 A.2d 281, 285 (1972)
 
 
 [19]
 The letter read in relevant part:
 We anticipate that installation can be made by your personnel at some convenient inspection time and we do not believe that the incidence of trouble would suggest that an immediate program be initiated to install the baffles.
 
 
 [20]
 The fact that WPS's April 15, 1965, letter to Westinghouse sought a baffle for a circuit breaker that Westinghouse's warning letter had not mentioned demonstrates some confusion on the part of WPS concerning which circuit breakers needed baffles
 
 
 [21]
 As one court observed:
 [t]he recent cases evaluating a manufacturer's duty to warn indicate that there should be no absolute rules; the adequacy of a warning is a question of fact to be decided on a case by case basis.... In most cases, however, the jury should determine the reasonableness and adequacy of the warnings provided under the unique circumstances of each case.
 Bryant v. Technical Research Co., 654 F.2d 1337, 1348 (9th Cir.1981).
 
 
 [22]
 The district court addressed the issue of superseding cause as follows:
 WPSC's awareness of the need to install the corrective baffle and its acknowledged capability to do so, as evidenced by its successful installation of the corrective baffles in the other oil circuit breakers, constitutes a superseding cause according to the argument of Westinghouse. While this argument appears to have merit, I will not comment on it further in his decision in light of my preceding finding. I simply mention the alternative ground and warn that my failure to discuss it fully should not be interpreted as a rejection of the argument.
 
 
 [23]
 The superseding cause doctrine is but one aspect of the concept of legal cause in tort cases. Legal causation is composed of two elements, cause-in-fact and proximate cause. Morgan v. Pennsylvania General Insurance Co., 87 Wis.2d 723, 735, 275 N.W.2d 660, 666 (1979). The test for whether certain conduct or action was a cause-in-fact of harm is whether that conduct was a substantial factor in producing that harm; it need not be the sole or primary factor in producing the injury. Clark v. Leisure Vehicles, Inc., 96 Wis.2d 607, 617, 292 N.W.2d 630, 635 (1980). Cause-in-fact is a factual question for the jury, in contrast to proximate cause, which is a legal issue to be decided by a judge. Hass v. Chicago & North Western Ry. Co., 48 Wis.2d 321, 326, 179 N.W.2d 885 (1970). An analysis of proximate cause requires an examination of various public policy considerations, which may preclude liability notwithstanding the existence of negligence and causation-in-fact. Morgan v. Pennsylvania General Insurance Co., 87 Wis.2d 723, 737, 275 N.W.2d 660, 667 (1979)
 
 
 [24]
 Other policy grounds for concluding that liability should not be imposed despite a finding of cause-in-fact include:
 (1) the injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.
 Stewart v. Wulf, 85 Wis.2d 461, 271 N.W.2d 79 (1978).
 
 
 [25]
 But cf., Hass v. Chicago & North Western Ry. Co., 48 Wis.2d 321, 179 N.W.2d 885 (1970) (factual resolution of the cause of action is not always required before applying public policy factors involved in a proximate cause analysis). Cases in which causally negligent tortfeasors have been relieved of liability are infrequent and involve unusual circumstances. Stewart v. Wulf, 85 Wis.2d 461, 479, 271 N.W.2d 79, 88 (1978). See also, Rieck v. Medical Protective Co., 64 Wis.2d 514, 219 N.W.2d 242 (1974) (couple who sued physician for failure to diagnose wife's pregnancy in time for abortion cannot recover damages for birth of a healthy child); Hass v. Chicago & North Western Ry. Co., 48 Wis.2d 321, 179 N.W.2d 885 (1970) (injured fire fighter cannot obtain damages from railway company that negligently allowed its engine to catch fire)
 
 
 [26]
 A number of courts have thus refused to hold that a dealer's negligence in failing to make repairs in a product absolves the manufacturer from liability for harm caused by defects in its products. Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129 (9th Cir.1977); Southern Pacific Co. v. Unarco, Inc., 42 Cal.App.3d 142, 116 Cal.Rptr. 847 (1974); Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss.1974). As the court in Matthews observed, the possibility that a product might leave a dealer's control without undergoing the repairs recommended in a warning letter to the dealer was reasonably foreseeable by the manufacturer. Id. at 178. Some courts have even held that whether a manufacturer could reasonably anticipate that third parties would neglect to respond to warnings concerning the manufacturer's products is an issue of fact for the jury. Balido v. Improved Machinery, Inc., 29 Cal.App.3d 633, 105 Cal.Rptr. 890, 900-01 (1973)
 
 
 [27]
 DeSantis v. Parker Feeders, Inc., 547 F.2d 357 (7th Cir.1976) addressed a related issue. In that case, we faced an argument that the trial court should have given a jury instruction concerning the duty of care of an installer of an automatic cattle feeder. The feeder was not constructed by the defendant, but the defendant had manufactured all of its parts. In holding that the defendant was not prejudiced by the trial court's failure to give the instruction, we noted
 [t]hat other parties may also have been negligent in regard to the DeSantis' cattle feeder in no way absolves Parker Feeders from the duties it had to those injured by its products when they were incorporated in such feeders.
 Id. at 364.