Wendy E. OLSEN, Marc Olsen–Despins, a minor, and Daniel Olsen–Despins, a minor, all by their Guardian, Sandra OLSEN,

Wisconsin Health Care Liability Insurance Plan, and Wisconsin Patients Compensation Fund, Plaintiffs,

v.

OHMEDA, a DIVISION OF The BOC GROUP, INC., and ABC Insurance Company, Defendants.

No. 91–C–1150.

United States District Court, E.D. Wisconsin.

Sept. 28, 1994.

Michael R. Wherry, Davis & Kuelthau, Donald H. Carlson, Riordan, Crivello, Carlson, Mentkowski & Steeves, Timothy J. Aiken, Aiken & Scaptur, Milwaukee, WI, for plaintiffs.

Francis H. LoCoco, Michael J. Gonring, Mitchell S. Moser, Jeffrey Morris, Quarles & Brady, Milwaukee, WI, for defendants.

## DECISION AND ORDER

RANDA, District Judge.

Plaintiff, Wendy Olsen, suffered significant brain damage while giving birth to twins at defendant, St. Luke's Hospital ("St. Luke's"), after defendant, nurse Nancy Myers ("Myers"), administered an excessive amount of an anesthetic agent to Wendy Olsen during that process. The twins were not in-

jured. The plaintiffs, Wendy E. Olsen, Marc Olsen–Despins and Daniel Olsen–Despins, both minors, all by their guardian, Sandra Olsen, (hereinafter "Olsen plaintiffs") alleged that defects in the anesthesia machine (Model 2000), used to administer the anesthetic and manufactured by the defendant, Ohmeda, and Ohmeda's negligence in failing to provide adequate post sale warnings to defendant, St. Luke's, of the dangers involved in the Model 2000's operation were causal of Wendy Olsen's injuries. The Olsen plaintiffs thus asserted causes of action rooted in theories of product liability and negligence. A jury trial was held on the liability phase of this personal injury action from January 31, 1994 to February 9, 1994. The jury did not find for the Olsen plaintiffs on the product liability claim. However, it did conclude that Ohmeda was fifty-five percent negligent, and that Ohmeda's negligence was causal of Wendy Olsen's injuries. In this regard, the verdict form submitted to the jury consisted of the following relevant liability questions:

> Question No. 1: Was the Ohmeda 2000 anesthesia machine in such a defective condition so as to make it unreasonably dangerous?
>
> Question No. 3: Was Ohmeda negligent?
>
> Question No. 5: Was Nancy Myers negligent?
>
> Question No. 7: Was St. Luke's Hospital negligent?

The jury answered "no" to Question No. 1. In response to Questions No. 3, 5 and 7, the jury found that defendants Ohmeda, Nancy Myers, the nurse anesthetist, and St. Luke's were all negligent, and that the negligence of all parties was causal of the injuries suffered by the plaintiff, Wendy Olsen. Specifically, the jury found Ohmeda fifty-five percent (55%) negligent, Myers ten percent (10%) negligent, and St. Luke's thirty-five percent (35%) negligent. Subsequent to the verdict, but prior to completion of the briefing on the post-trial motions, Ohmeda entered into a settlement agreement with the Olsen plaintiffs. Plaintiff, Wisconsin Patients Compensation Fund ("Fund") did not participate in the settlement with Ohmeda and its interests relative to the case remain alive.[1] Ohmeda now moves the Court for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59. For the reasons set forth below, the Court grants Ohmeda's motions.

## ANALYSIS

I. *Motion for Judgment as a Matter of Law.*[2]

A federal court, sitting in diversity, applies state law in its consideration of a motion brought pursuant to Fed.R.Civ.P. 50(b). *Allison v. Ticor Title Insurance Company,* 979 F.2d 1187, 1195 (7th Cir.1992); *Krist v. Eli Lilly & Co.,* 897 F.2d 293, 296 (7th Cir.1990).[3] In Wisconsin, such a motion is governed by Wis.Stat. § 805.14(5)(b):

> * * * (b) Motion for judgment notwithstanding verdict. A party against whom a verdict has been rendered may move the Court for a judgment notwithstanding the verdict in the event that the verdict is proper but, for reasons evident in the rec-

---

1. Prior to the trial the Olsens entered into a Pierringer release and assignment of claims with Nancy Myers, St. Luke's and the Fund. This "agreement" is the subject of a declaratory judgment request filed by the Fund, which will not be taken up here.

2. The Fund first objects to Ohmeda's motion on procedural grounds in that Ohmeda was not timely in bringing it (i.e., Ohmeda failed to move for a directed verdict at the close of all the evidence pursuant to 50(b) of the Federal Rules of Civil Procedure). While Ohmeda's motion was not made at the close of all the evidence, the Seventh Circuit rejects the strict or literal view of Rule 50(b). The Seventh Circuit relies upon considerations of actual prejudice to the non-

moving party reflected in such things such as whether similar arguments by the movant were made at other stages of trial (i.e., the close of the non-movant's case, at the instruction phase, during trial, etc.) Since Ohmeda made the motions and arguments it now makes before and during the trial, including the instruction conference, the Fund cannot show that it was prejudiced by Ohmeda's failure to renew the motion after the close of all the evidence. *See McKinnon v. Berwyn,* 750 F.2d 1383 (7th Cir.1984).

3. The Fund's citation to *Garrett v. Barnes,* 961 F.2d 629 (7th Cir.1992) and *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405 (7th Cir.1984) is misplaced as neither case involved the application of *Wisconsin* law.

ord which bear upon matters not included in the verdict, the movant should have judgment.

"[T]he motion does not raise the issue of whether there is sufficient evidence to support the verdict and the application may not be granted on the ground that the verdict is against the great weight of the evidence." *Kolpin v. Pioneer Power & Light Co.*, 162 Wis.2d 1, 469 N.W.2d 595, 606 (1991) (citation omitted); *see also Bennett v. Larsen Co.*, 118 Wis.2d 681, 348 N.W.2d 540, 544 (1984); *Ferraro v. Koelsch*, 119 Wis.2d 407, 350 N.W.2d 735, 737 (Ct.App.1984) ("If there is any evidence other than mere conjecture or incredible evidence to support the verdict the standard has been met."). However, "if there is no such evidence [the] court can change the [verdict] as a matter of law." *Dettmann v. Flanary*, 86 Wis.2d 728, 273 N.W.2d 348, 353 (1979) citing *Lueck v. Janesville*, 57 Wis.2d 254, 204 N.W.2d 6, 10 (1973). Evidence is incredible if it is "in conflict with the uniform course of nature or with fully established or conceded facts". *Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Constr. Corp.*, 96 Wis.2d 314, 291 N.W.2d 825, 837 (1980) (citations omitted). With this standard in mind, the Court reviews Ohmeda's motion.

What remained for the jury to decide at the close of the evidence relative to Ohmeda was the following: Was the product defective and unreasonably dangerous? (Question No. 1); and/or Was Ohmeda negligent? (Question No. 3). In connection with Question No. 3, the jury's duty, given the applicable law, was to decide Ohmeda's negligence on the basis of a post sale failure to warn St. Luke's of a defect or defective condition in the Model 2000.[4] Since the jury found no liability on the part of Ohmeda on the products liability claim, we deal with Question No. 3.

## A. *Nature of the Negligence Claim.*

Critical to this motion is the question of what negligence the jury was required to consider in light of the duty placed upon Ohmeda. Extensive discussions were had relative to this issue before, during, and after the trial. The Olsens' attorney, Mr. Timothy Aiken, conceded that this was not really a product liability case but one sounding in negligence.[5] In turn, that negligence was defined by the Fund's attorney, Mr. Donald Carlson, as the type of negligence connected to the duty of a manufacturer as outlined in the case of *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915 (1979).[6]

The Court, in reiterating an earlier position, stated on the second day of trial that:

The negligence of a manufacturer, the other thing that is pursued by the plaintiffs in this case, is one theory which the Court indicated yesterday establishes a duty to—under *Kozlowski*—a duty to perhaps warn a user of its product of safety changes.

(Trial Tr. at 146, Lines 5–9).

Ohmeda is correct then in asserting that the standards which the jury was required to apply in assessing the evidence, and against which a jury verdict is to be analyzed, were the duty and negligence standards outlined in the *Kozlowski* case.

While the Fund indicates that the "jury may have concluded" negligence on Ohmeda's part on several grounds other than *Kozlowski*, those grounds were never raised or disclosed prior to or during the trial in all of the discussions Court and counsel had on the matter, including the pretrial reports. Indeed, in the pretrial reports dated June 8, 1993 and January 21, 1994, the two negligence theories disclosed were (1) Ohmeda's failure to warn post sale, and (2) failure to upgrade the Model 2000. Accordingly, the

---

4. More specifically, the plaintiffs focused on the failure to warn of the dangers involved relative to dual flowmeters on the Model 2000 which were utilized to calculate the flow of anesthetic to patients.

5. "I think that this is a negligence theory against Ohmeda as a servicer." (Trial Tr. at 35; *see also* Trial Tr. at 46, Lines 20–22).

6. "[T]his situation is akin to the *Kozlowski* case *in just about every respect*. And the law is quite clear that in those circumstances where the user of the machine thinks its being used appropriately ... there is (sic) dangers that the manufacturer *is aware of* ... they have that obligation to get that information to the owners." (Emphasis ours) (Instruction Conference Tr. at 44)

Fund may not now advance new theories in an effort to support the jury's verdict. *See Erff v. Markhon Industries, Inc.,* 781 F.2d 613, 617 (7th Cir.1986), *Price v. Inland Oil Company,* 646 F.2d 90, 95 (3rd Cir.1981); *Flannery v. Carroll,* 676 F.2d 126, 129 (5th Cir.1982); *Randolph County v. Alabama Power Company,* 784 F.2d 1067, 1072 (11th Cir.1986).[7]

During trial, plaintiffs cited the Court to the standards of negligence outlined in *Gracyalny v. Westinghouse Electric Corp.,* 723 F.2d 1311 (7th Cir.1983) and *Rolph v. EBI Cos.,* 159 Wis.2d 518, 464 N.W.2d 667 (1991). Those cases are distinguishable from the case at bar. *Gracyalny* does not apply because it was a failure to retrofit case. Ohmeda did not undertake a duty to retrofit or upgrade. In *Gracyalny* also, the defendant, Westinghouse, was *immediately* aware of a defect in its product and *immediately* undertook to furnish safety devices. *Rolph* does not apply either because it too, was a retrofit case. Ohmeda did not hold itself out as a retrofitter of old machines (*i.e.,* that the Model 2000 would be brought up to the standards of current models). Thus, we are left with the standards imposed by *Kozlowski,* and its description of the decision to impose a post sale duty to warn as a "close case."

The duty imposed on a manufacturer by *Kozlowski* was the "... continuing duty to warn of an alleged defective condition in light of the availability of a 1946 safety device." *Kozlowski, supra,* 275 N.W.2d at 923. *Kozlowski,* in discussing the trial court's error in directing verdict for the defendants in that case, stated the negligence question this way:

> Did the trial court err in directing verdict ... on whether ... the defendant caused the existence of an unreasonably dangerous condition by failing to inform users of the defective condition and the availability

of a safety device designed to prevent that condition.

(*Id.* 275 N.W.2d at 918.)

█ *Kozlowski* presents, therefore, the following elements in a manufacturer's post sale duty to warn. First, the duty to warn post sale must arise in a specific context. *Kozlowski* requires examination of the nature of the industry. Factors such as the number of customers (the *Kozlowski* court presumed that the manufacturer knew all of its customers), units sold, customers' expectations, etc., must be taken into consideration. The court stated:

> We do not in this decision hold that there is an absolute continuing duty year after year for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer, and the nature of that industry, bears no similarity to the realities of manufacturing and marketing household goods such as fans, snow blowers, or lawn mowers, which have become increasingly hazard proof with each succeeding model. ... It would place an unreasonable duty upon the manufacturers if they were required to trace the ownership of each unit and warn annually of new safety improvements over a thirty-five year period.
>
> [However] ... the sausage stuffer industry is far more limited in scope.

*Id.* 275 N.W.2d at 923–924.

Second, the plaintiff must show, or must have shown, that the manufacturer learned about, or should have learned about, a defect or defective condition in its product after the sale of said product. In *Kozlowski,* as in *Gracyalny,* the manufacturer learned of a defect or defective condition that existed in its original product some time after the initial sale.[8] In *Gracyalny,* this knowledge was almost immediate.

---

7. The Court indicated at the start of the trial that there may have been a duty to retrofit or upgrade the Model 2000 but only if the evidence disclosed that Ohmeda, through its serviceman, Sam Johnson, undertook that duty. The evidence discloses no such undertaking on the part of Ohmeda.

8. In this connection, the *Kozlowski* court, in remanding the case, referenced testimony from the trial court record that indicated that the manufacturer was aware of "a few near misses," referring to incidents similar to that which ultimately caused Kozlowski's death. *Id.* 275 N.W.2d at 921. This vital fact, as will be seen *infra,* is completely absent from the case at bar.

Third, in *Kozlowski*, the manufacturer developed a safety device in response to the known post sale defect or defective condition. Thus, we have a safety feature developed after initial manufacture, in response to a known post sale defect or defective condition.

Fourth, the manufacturer, aware of a known post sale defect or defective condition, and having developed a safety device to correct that condition, is then required to notify its circle of customers of said defect or defective condition and the safety device developed in response thereto. Otherwise stated, the plaintiff must show that the user was unaware of the defect or defective condition and the safety device designed to prevent it.

Having defined the *Kozlowski* elements, we now analyze whether the plaintiffs presented any credible evidence to support the jury's verdict.

### B. *The Evidence.*

#### 1. *"Nature of the Industry."*

■ Plaintiffs met their first burden. The evidence disclosed that the manufacture and marketing of anesthesia machines is conducted in a narrow industry and market. In this regard, it is not unlike the sausage stuffing machine industry, which was the context of *Kozlowski.*

#### 2. *Ohmeda's Awareness of a "Post Sale Defect or Defective Condition."*

■ The credible evidence does not support a finding by a reasonable jury that Ohmeda was aware of, or should have been aware of, a post sale defect or defective condition in the Model 2000 primarily because that evidence established that no defect or defective condition, as contemplated by *Kozlowski*, existed. Therefore, no reason-

able jury could have found for the plaintiffs on this issue or element.[9]

It is crystal clear from the evidence that during the long post sale period that the Model 2000 was used, it was used without any incidents of the type that are the subject of this lawsuit.[10] The evidence further disclosed that, to Ohmeda's knowledge, the Model 2000, put to its proper use, functioned in all types of hospital environments over a long period of years without drawing any complaints and without causing any damage or injury. To Ohmeda's knowledge, the machine was never put to an unintended use by any user and, while Ohmeda made many observations of its product over a long period of time, none of those observations were of defects or defective conditions of the type found in *Kozlowski*. Indeed, the evidence disclosed that Ohmeda was aware of no defect or defective condition in its product at all.

Given these circumstances, what the Fund must argue for, and seems to be arguing for, is an expansion of the continuing duty of a manufacturer to warn that is clearly unwarranted by the *Kozlowski* decision. *Kozlowski* places the continuing duty to warn on a manufacturer when a post sale defect is first discovered.[11] Indeed, *Kozlowski* arguably creates the duty to warn of a post sale defect only when a safety device has been developed in response thereto. (See section B.3, *infra*.) But the Fund argues that a manufacturer has a continuing duty to warn of such things as safety developments (unrelated to known defects), retrofit kits (not designed as safety devices), and other product improvements and related matters. Such an interpretation stretches *Kozlowski* beyond recognition.

However, even if we were to accept the position that a duty was placed on Ohmeda to warn of these things in the absence of a known defect or defective condition, and if

9. Impacting on the consideration of the evidence is the fact that the jury found, in answering "no" to Question No. 1 on the verdict, that the Model 2000 was not in such a defective condition so as to make it unreasonably dangerous. There was no such jury determination in *Kozlowski* or *Gracyalny*. This means, of course, that the Model 2000 was not defectively designed and that the appropriate warnings were given at the point of sale from a products liability standpoint.

10. Remember, in *Kozlowski*, the court remanded the case making specific reference to the manufacturer's awareness of "near misses." *See* fn. 8, *supra.*

11. In creating this duty *in a known defect case* it is notable that the *Kozlowski* court characterized the duty as one arising from a "close case."

we assume that Ohmeda failed to provide this information to its users in the form of a warning, Ohmeda could not be found negligent. In this connection, the strongest evidence the Fund can muster to support this position is the following: (1) Ohmeda knew of, or should have known of, the fact that the Model 2000 was an older machine that lacked "crucial" safety features which were found on newer models (safety features recommended by ANSI);[12] (2) the Model 2000 was being used in secondary locations with less frequency, breeding unfamiliarity among users;[13] (3) Ohmeda was aware, from a Dorsch and Dorsch textbook on anesthesia titled, "Understanding Anesthesia Equipment" that "[a] frequent problem (with models such as the 2000) is incorrect calculations of flow through the vaporizer. When the flowmeters are in parallel, care must be taken that the fine and coarse flowmeters are not confused." (Trial Tr. at 891–892; Trial Ex. 155); and (4) a report compiled by Ohmeda entitled "Report on the Proactive Management of Anesthesia Safety Through the Use of Anesthesia System Preventative and Warning Devices" which stated:

> The older anesthesia units, such as Model 2000, lacked crucial safety features required by ANSI z. 79. The problem is compounded because older anesthesia units are placed in some secondary locations, such as obstetrical suites, leaving the anesthetist less familiar with the machine controls and limits.

(Trial Ex. at 76(a)).

The Fund couples the above evidence with the testimony of Ohmeda's safety specialist, Chalmers Goodyear. Goodyear testified that Ohmeda knew that using the wrong control knob on the Vernitrol vaporizer could cause injury or death. The Fund argues that Ohmeda's failure to warn St. Luke's of this combination of facts was negligence.

Assuming again a continuing duty to warn of this type of information, the facts known to Ohmeda through trade publications, through comparisons of the Model 2000 with newer models, and discussions of safety and efficiency features in company manuals, advertisements and safety brochures, cannot, as a matter of law, support a finding that Ohmeda was negligent in failing to warn.

First, the fact that the Model 2000 lacked some "crucial" safety features of newer models is not a rare occurrence in the context of a developing product line. In addition, the evidence disclosed that they were not "crucial" safety features developed in response to a known defect and more specifically to defects in the Vernitrol vaporizer. A safety advance or feature, in and of itself, hardly can be called a defect, and safety improvements do not make older models defective. Second, the fact that older models are ultimately put to secondary uses as a user upgrades or graduates to newer models, is also unremarkable. Less familiarity with the older model would naturally then occur. It is not negligence to fail to warn of this obvious fact. Third, where an option exists on a machine which allows for the administration of, as in this case, an anesthetic agent from side-by-side or dual flowmeters, not only textbooks such as Dorsch and Dorsch tell us, but common sense dictates that care must be used to avoid confusion. A manufacturer of a product (particularly one found by a jury not to be unreasonably dangerous) is not negligent if it fails to warn the user that care must be taken to avoid confusion in its use. Fourth, the opinion of anyone, including Chalmers Goodyear, that misuse of the Model 2000 can cause death, can be said about any product, from simple sugar to machinery as non-complex as a hair dryer.

Therefore, even if we applied the duty to warn urged by the Fund there is no credible evidence to support a finding that Ohmeda, in failing to convey this information to its customers in the form of a warning, was

---

12. These were not safety features created in response to a known defect.

13. The evidence disclosed that these "secondary" locations were not *new* locations where the Model 2000 had never been used before. In fact

negligent.[14] In any event, the actual duty to warn under *Kozlowski* arises upon discovery of the post sale defect.

 In this connection, if the safety improvements in the product were designed to correct or alleviate a known defect in the older product *Kozlowski* tells us that there is a duty to warn the user of the safety improvement (if a failure to warn creates an "unreasonably dangerous condition"). The Fund's error in response to this standard is, as previously discussed, in asserting that *any* safety improvements made to a product require the manufacturer to warn the user. Underpinning this position is the implication that a post sale safety device or improvement must necessarily be a response to a known defect. In other words, the required defect triggering the duty to warn is established by the presence of a safety device or improvement. However, logic, and certainly *Kozlowski*, does not permit the inference that any safety improvement or device is simply the reverse side of the defect coin. A defect is not established in a product solely because an improvement is made to the product. Older products are not made defective nor are they made unreasonably dangerous because they are old or because newer machines or products are better or safer. A "missing" defect cannot be supplied in this manner. The presence of safety improvements did not alert Ohmeda to a post sale defect in its machine.[15]

### 3. "Safety Device".

 The *Kozlowski* court stated that if safety devices are developed for a product in response to a known post sale defect or defective condition, the manufacturer has a duty to warn the user of that safety device if a failure to warn would create an "unreason-

ably dangerous condition." Indeed, *Kozlowski* holds itself out as a post sale duty to warn of a safety device case; i.e., did the manufacturer have a duty to warn of "an alleged defective condition in light of the availability of a ... safety device." Put another way, *Kozlowski* asks whether the manufacturer created an "unreasonably dangerous condition" by failing to inform users of the defective condition *and* the availability of a safety device designed to prevent that condition. In this connection, the Fund highlights the fact that a calibrated vaporizer was available to retrofit the Model 2000's so that the dual flowmeter, that is, the Vernitrol vaporizer, would be eliminated. Nothing in the record, however, establishes that the calibrated vaporizer was a safety device designed to correct a defect or defective condition in the Model 2000. Again, while the Fund relies upon the testimony of Ohmeda's specialist, Chalmers Goodyear, to the effect that using the wrong control knob on the Vernitrol vaporizer could cause injury or death, nothing in the record suggests that the calibrated vaporizer was designed or produced to address any such problem with the dual flowmeter design. The evidence discloses that Ohmeda never considered the calibrated vaporizer as a safety device, it never advertised, promoted or marketed it as such, and the calibrated vaporizer was not even listed as a safety enhancement in its own literature on safety enhancements. Indeed, Mr. Paul Baumgart, Ohmeda's Director of Marketing, testified to the fact that the calibrated vaporizer was part of a giveaway program in order to promote the use of the anesthetic agent, Forane. In addition, the same witness testified that the calibrated vaporizers were often installed right alongside a dual flowmeter Vernitrol vaporizer, allowing the user of said machine the option

these machines had, it appears from the evidence, always been used there and elsewhere.

**14.** In addition, assuming that Ohmeda was under a continuing duty to warn of these types of matters and of this type of information, the failure to warn could not produce, as a matter of law, an "unreasonably dangerous condition" in light of St. Luke's knowledge of the machine and the Vernitrol vaporizer discussed *infra*.

**15.** At the instruction conference the Court stated, "All we are talking about is a 'defect' that has

occurred within a space of time that is reflected in advance of the product. In other words, advances in technology have made, at least according to some witnesses, the old technology outdated, [a]nd, hence, in certain circumstances now aware to the manufacturer, dangerous. I don't know if they can be exactly categorized as the traditional defect in the product." (Instruction Conference Tr. at 47, Lines 19–25, February 8, 1994).

of using one or the other. Indeed Mr. Baumgart testified that in addition to all of this, they, that is Ohmeda, received orders for Vernitrol vaporizers with two knobs as late as 1985 (Trial Tr. at 537:13–538:8).

The Fund presented no credible evidence to show that the calibrated vaporizer was produced or sold in response to a recognized defect or defective condition in the Model 2000.[16]

### 4. Manufacturers' Duty to Warn of Safety Device.

■ The final element of a Kozlowski claim that must be proven by the plaintiff is that Ohmeda failed to warn the user of the defect or defective condition, and, if necessary, the safety device developed in response thereto. Conversely, the Fund was required to show that St. Luke's was unaware of the defect and/or safety devices. Even if the plaintiffs had shown that the calibrated vaporizer was a safety device developed in response to a known defect or defective condition in the Model 2000, or even if the plaintiff was relieved of its duty under the facts of this case to meet that element, plaintiff failed to show that St. Luke's was unaware of the calibrated vaporizer or the facts which the Fund argues created the "defective condition" in this case. The evidence clearly shows that St. Luke's not only knew about the calibrated vaporizers, but was using the calibrated vaporizers on some of their machines at the time of this incident. This fact situation is completely different from the Kozlowski scenario, where the manufacturer's representative not only knew about a safety device developed in response to a known defect or defective condition, but failed on several visits to the user to inform the user of either the defect or the safety device. The Kozlowski user was unaware of both. The facts of this case are radically different.

Plaintiffs have failed to meet three of the four elements required by Kozlowski. They failed to prove a defect or defective condition in the Model 2000 and/or that Ohmeda had knowledge of a post sale defect or defective condition in the Model 2000. They failed to prove that Ohmeda developed the calibrated vaporizer as a safety device designed to address the defect or defective condition known by Ohmeda, and they failed to show that Ohmeda did not make the calibrated vaporizer available to St. Luke's or that St. Luke's was unaware of the existence of the calibrated vaporizer. In conclusion then, there is no credible evidence to support the jury's verdict that Ohmeda was negligent. Ohmeda's motion for judgment as a matter of law must be granted.

### II. Ohmeda's Motion for New Trial Pursuant to Fed.R.Civ.P. 59.[17]

■ Unlike a motion pursuant to Rule 50(b), a motion for a new trial pursuant to

---

**16.** The Fund, as is clear from previous discussion, argues that, although Kozlowski was a failure to warn of a safety device case, proof of a safety device which was created in response to a known defect may not be required in all cases; i.e., a manufacturer's knowledge of a post sale defect alone and its failure to warn of said defect may create an "unreasonably dangerous condition" giving rise to the duty to warn. Kozlowski does not speak directly to this point and, indeed, the case seems to suggest the opposite; i.e., a duty to warn of a post sale defect only arises "in light of the availability of a ... safety device." Nevertheless, the Court allowed an instruction, over the objection of Ohmeda, which stated that it was the manufacturer's duty to warn the owner of a post sale defect which the manufacturer observed "while servicing the machine." Clearly, if the safety device element is eliminated from Kozlowski, the "while servicing the machine" language must be given a narrow application. In the case at bar, the language of the instruction must revolve around the activities of Ohmeda's service representative, Sam Johnson, and what he personally observed. A more expansive reading is not justified under Kozlowski.

Nothing in the record establishes that Sam Johnson observed a defect or dangerous condition in the Model 2000 during his contacts with St. Luke's. On the other hand, the manufacturer's representative in the Kozlowski case clearly knew of the defect in the machine and continued to visit the user without warning the user of said defect.

In any event, even if the Fund is relieved of the burden of proving Ohmeda's development of a safety device in response to a known defect, the Fund has failed to meet its first burden of showing the existence of a post sale defect or defective condition in the Model 2000.

**17.** Fed.R.Civ.P. 50(b) provides in pertinent part, "[a] motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be request-

Rule 59 is determined by federal law. *Wassell v. Adams,* 865 F.2d 849, 854 (7th Cir. 1989); *Davlan v. Otis Elevator Co.,* 816 F.2d 287, 289 (7th Cir.1987). Such a motion is left to the sound discretion of the trial judge. *Roggow v. Mineral Processing Corp., Needmore Processing Div,* 894 F.2d 246, 249 (7th Cir.1990). "A new trial can be granted only when the jury's verdict is against the clear weight of the evidence." *Davlan, supra* at 289. In addition, a new trial may be warranted if judicial error was substantial enough to deny the movant a fair trial. *Perry v. Larson,* 794 F.2d 279, 285 (7th Cir. 1986). As the Court's analysis in Part I demonstrates, the jury's verdict was "against the clear weight of the evidence." Accordingly, Ohmeda is entitled to a new trial in the event that the Court's judgment in Ohmeda's favor is reversed or vacated.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Ohmeda's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) is **GRANTED;** and

2. Pursuant to Fed.R.Civ.P. 50(c)(1), on the condition that the judgment in Ohmeda's favor is reversed or vacated, Ohmeda's motion for a new trial pursuant to Fed.R.Civ.P. 59 is **GRANTED.**

 **SO ORDERED.**

---

ed in the alternative." Fed.R.Civ.P. 50(c)(1) provides in pertinent part, "[i]f the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacate or reversed, and shall specify the grounds for granting or denying the motion for a new trial." .